Peck, C.J.
In support of the demurrer it is claimed, that, under the facts stated in the reply, the bonds issued by the county commissioners were void in law, as having been issued without lawful authority; and that a voluntary payment by the commissioners, was in their own wrong, and conferred upon them no legal right to exact indemnity from defendant, under his bond and mortgage, for various reasons.
1. Because the act of March 19,1851, under which they were issued, is in violation of the constitution of 1802, in force when the act was passed; and also because it is inconsistent with the constitution of 1851, in force when the bonds were issued, and therefore repealed by that instrument.
It conflicts with the constitution of 1802, it is said, because it assumes to authorize the.commissioners to loan the credit of the county, and subject its revenues from taxation to a possible liability for private purposes, in violation of section 4, article 8, of that instrument, which declares the inviolability of private property, except for public purposes.
Were this the true scope and object of the law, it would be obnoxious to the objection. It has, however, by repeated decisions, become the settled law under that constitution, that a railroad was such a publie enterprise, as justified the legislature in conferring upon it the right of eminent domain, and also of authorizing counties and other municipal corporations to subscribe to its capital stock. This, indeed, is conceded by the counsel for the defendant,, but it is said that in all such cases, the counties and other corporations became stockholders and participants in the profits of the investment, and in the control and direction of the enterprise. Such considerations might induce the local authorities to subscribe, but are insufficient to warrant legislative permission to do so. It is the *267 . nature and character of the enterprise, its public utility and importance, and not the anticipated profits resulting from it, which confers the legal right upon such corporations to become stockholders. Regarded in this light, it is difficult to discover any serious objection to the substitution of the public credit, upon ample indemnity, for a subscription to capital, stock. Both have the same end in view, and are to be justified upon the same ground — the aiding of a public improvement which has a direct tendency to develop the resources of the country; cheapen and facilitate the transmission of its products, and augment its aggregate wealth and prosperity. Indeed, it would seem to be the more desirable course to pursue, as attaining the public object a.t the least hazard of the public means and credit.
This seems to have been the light in which a loan of the county credit was regarded in C. W. & Z. R. R. v. Qomm’rs of Clinton county (1 Ohio St. Rep. 77), one feature of the act held constitutional in that case, being, that “before any bonds ” (given for subscription) “were issued, the company, were to agree in writing to pay all interest that might accrue upon them, being entitled to receive the dividends from the stock, until they (the bonds) were redeemed.” It also seems to have been recognized as an existing abuse, by the framers of the new constitution and is classed with county subscriptions to stock, o.nd prohibited thereafter by section 6, of article 8. Loans of the public credit in aid of such improvements, seem also to be so classed and regarded by Mr. Smith, in his treatise upon constitutional construction, 417 — 423.
If these considerations do not place the validity of the act under the constitution of 1802, in this particular, beyond dispute, they are at least of that gravity and importance, which, upon the established rules of constitutional construction, prevent us from pronouncing it invalid.
The law under which the bonds were issued, was passed in the month of March, preceding the adoption of the constitution of 1851, but the bonds were not issued nor the vote taken, until after that period, so that the right to issue the oonds had not vested in the commissioners, when the present *268 constitution went into operation; and the argument of demurrants is, that the statute, so far as it authorizes the subsequent vote and issue of bonds, is inconsistent with article 8, sec. 6, of that instrument, which declares: “ The general assembly shall never authorize any county, town or township, by a vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever ; or to raise money for, or loan its credit to or in aid of, any such company, corporation or association.”
This section, with other cognate provisions of the constitution, was fully examined at the December term, 1853, of this court, in the well-considered case of Cass v. Dillon (2 Ohio, St. Rep. 607), which was identical in its main features with the one now presented. And it was held by a majority of the court, in that case, that section 6, above quoted, “plainly refers to future legislation alone, and that the acts it prohibits are not subscriptions under existing laws, hut the making of any more such laws;” and that the statute then under consideration, passed March 24, 1851, authorizing a subscription to stock of a railroad by Muskingum county, if approved by a vote of the electors, which vote was not given until after the constitution took effect, was not inconsistent with it, but remained a valid and subsisting enactment.
The case of Cass v. Dillon was re-examined and the decision cordially approved, in State ex rel. Smead v. Union Township (8 Ohio St. Rep. 400), which arose upon a similar statute and state of facts, and it is there said, that the validity of these statutes, under such circumstances, “ can no longer be regarded by the court as doubtful.” The principles of the de' cisión seem also to have been recognized and assumed in Garrett v. Auditor, etc., 7 Ohio St. Rep. 327; and State ex rel. Drake v. Roosa et al., 11 Ohio St. Rep. 16.
But we are asked, after a lapse of more than ten years, tc reconsider and overrule Cass v. Dillon; and we have examined with some care the opinions of the majority and minority of the court in that case, and while we acknowledged that if the questions involved were for the first time presented, some of the members concurring in this decision would probably *269 hesitate to adopt the opinion of the majority in that ease, we all feel constrained to say, that it is now too late to reverse that decision, as a contrary holding, after years of acquiescence, would involve consequences too serious to be contemplated.
When the constitution of 1851 was adopted, there were upon the statute books, several acts of a character similar to the one under consideration, then wholly and partially suspended, to which the restrictions of that instrument imparted a factitious importance. A contrary decision then would have affected, comparatively, few persons and to a limited extent; but no one can justly estimate the consequences of such a decision at this time upon thousands who, relying upon the legal validity of those enactments, have contributed their money and labor to advance the contemplated improvements. The salutary maxim stare decisis is peculiarly applicable to such a decision, followed by such an acquiescence.
It is further claimed in support of the demurrer, that even if the statute is a constitutional and still subsisting enactment, there has nevertheless been such a failure to comply with its conditions in issuing the bonds, as renders them in law invalid.
This results, it is said, from the admission of the reply, that sufficient means to complete the road had not in fact been obtained ; coupled with the statutory prohibition against issuing the bonds until such sufficient means had been provided.
It appears from the reply, that a vote had been duly taken, conferring authority to loan the credit of the county, and execute the bonds. That before any delivery of them, the defendant, being a bona fide subscriber to the stock of the road in the sum of $3000, applied to the plaintiffs to procure bonds to that amount, to be appropriated, at par, in payment of his stock subscription. That plaintiffs after a careful, thorough and protracted investigation of the means provided by the company for the completion of its road, and the amount necessary to complete it, became satisfied that ample means had been provided by the company in bona fide stock subscriptions, and otherwise, to insure the completion of the railroad connection specified in the act. That thereupon the plaintiffs *270 delivered to defendant county bonds to that amount to be applied to his stock, and received from him in return, a bond and mortgage upon unincumbered real estate as required by the statute. That the county bonds were applied by defendant in payment of his stock subscription at par, and were subsequently negotiated by the company to various bona fide holders, and that the same are still outstanding. That the defendant has never offered to return said bonds or any part thereof, nor any other county bonds in lieu of the same.
Erom this it appears, that the county bonds were rightfully executed by plaintiffs, and that the illegality, if any, consists in the issuing of them to the defendant, before it was ascertained to a certainty, that sufficient means had in fact been provided for the completion of the road. It may be doubted if the defendant is not estopped from setting up the defense. He has received and still retains the par value of the bonds. His requisition of them under the statute was an admission that the conditions of the act had been complied with, and his sending them forth for circulation, was a representation that they were legal and valid instruments. But however this may be, we are of the opinion, that, upon the facts stated in the reply, there was no such illegality in the delivery of the bonds, as renders them void in law.
A just and proper construction of the statute, authorizes the commissioners to issue the bonds whenever they, acting in good faith, and after a careful investigation into the resources of the company, are satisfied that sufficient means have been provided to insure the completion of the work. It is plain that the act contemplates that the bonds of the plaintiff, representing a portion of the capital stock of the company, were to form a part of the means provided for completion of the road, and to be used in raising funds for its construction. This is apparent from the provision that “ no part of the proceeds arising therefrom ” (i. e., the bonds) “ shall be expended, without the limits of the county.” It could not then have been intended to prohibit their issue until the work was entirely finished. The bonds were to be disposed of in market, before it could possibly be ascertained that the “ sum provided " *271 was in fact sufficient to complete the road, indicating clearly that something less than absolute certainty was required. It is absurd to suppose that the legality of the bonds so issued and put in circulation, was to depend upon the subsequent ascertainment of the sufficiency of the means provided for completion of the road. Such a contingency, affecting the legality of the bonds, would utterly destroy their market value and defeat the whole object of the statute.
These considerations indicate, that absolute certainty as to the sufficiency of the means provided, was not required to precede the issue of the bonds, and that when once lawfully issued, the bonds were not to be affected by the subsequent ascertainment that those means were, in truth, insufficient. The requirement of the section is, merely, that there should be a reasonable certainty that the means provided would thereafter prove to be sufficient. It called for the exercise of judgment to determine whether a fact to occur in the future, was reasonably certain to happen. No person or tribunal is expressly invested by the statute with power to determine this question, and we are, therefore, of the opinion that the statute, in imposing the duty upon the commissioners, of issuing the bonds if a sufficient sum is provided, and prohibiting them from doing so if the sum is insufficient, necessarily invested them with the power to determine as to the sufficiency of the means provided for the completion of the road. The reply shows conclusively, that the commissioners, in discharging this duty, acted in good faith, and with more than ordinary diligence and caution. If they did so, the bonds were rightfully issued, and a subsequent discovery of an insufficiency would not render the bonds invalid.
Lastly it is said, the bonds are void, because of the right, reserved to the county, of paying the principal sum at any time after five years from the date of the bonds.
The only authority to issue bonds under the statute, is, to issue bonds “payable in twenty years from date,” and the proviso of the third section clearly prohibits the issuing of any other or different bonds.
The bonds, as appears by the copy of one annexed to the *272 reply, each acknowledge an indebtedness by the county to the bearer of $1000, to be paid in the city of New York, March 1, 1873, with interest at the rate of seven per cent, from March 1, 1853, payable annually in the city of New York, and in so far, is a full and complete execution of the power; and were this all, no doubt could be entertained as to their validity. But the following distinct clause is then inserted: “ After five years from date, the principal of these bonds shall be payable at the pleasure of the commissioners, at any time before the first day of March, 1873, on giving sixty days’ notice of the same in said city of New York.” If this reservation of the privilege of earlier payment is void, the bonds are a full and complete execution of the power, and, therefore, are valid; but if it is not void, there would seem to be a substantial difference between the bonds authorized, and the bonds executed. The one was to be payable at a certain time, and to run twenty years before maturity, while the other is to become payable, at the option of the obligors, at any time between five and twenty years. This uncertainty as to the duration of the loan, might seriously affect the market value of the bonds; a consideration which the legislature and the electors may well be supposed to have had in view in authorizing and approving the loan. At all events the statute only authorizes bonds having twenty years to run, and a bond maturing at an earlier period, is not, in the language of the proviso of section 3, such a bond as had been therein “ before specified.” It is a question of power and not of expediency — of identity and not of possible equivalents. The statute created the commissioners the agents of the county in perfecting the loan, and authorized them, upon a certain contingency, to execute and issue to holders of stock in the railroad, bonds having a specified time to run, and payable at a particular place. This was d.one, but the commissioners in doing it, exceeded them powers by adding a clause enabling the obligors to pay it at an earlier day.
The general rule in such cases is, that “ where there is a complete execution of the authority, and something ex abundanti is added, then, the execution is good, and the excess, *273 only, is void; but where there is not a complete execution of the power, or'where the boundaries between the excess and the rightful execution are not distinguishable, there the whole is void — i. e., at law, though many cases of partial execution may be upheld in equity. Story on Agency, secs. 166, 167, et seq.; 2 Sugden on Powers.
This rule, if applied to the bonds in question, would seem to establish their validity. In -the body of the bond there is a full and complete execution of the power, and the reservation of the privilege of making earlier payment, is a distinct stipulation, ex abundanti, and prohibited by the statute.
But it is said> that this salutary rule has reference only to agencies and powers crea'ted by acts of individuals, and not to powers created and regulated by statute, which must be strictly pursued; and we have been referred to the opinion of Holt, Ch. J., in Smartle v. Penhallow (2 Lord Raym. 1000), as establishing this distinction. The remark of Lord Holt is merely obiter, but when fairly understood is sound law. The language relied on as creating this distinction is as follows : “ As for the case put' upon the statute of Elizabeth, wherein a lease is made by a bishop for two-and-twenty years, it shall be void in the whole, and shall not be good against the successor for one-and-twenty years, because the statute ties it up to that form.” The statutes referred to, are 13 Eliz., cap. 10, and 18 Eliz., cap. 11 (see Statutes at Large), to prevent alienations of church lands to the injury of the successors ; and the remark of Lord Holt is evidently based upon the peculiar terms of those enactments — “ all grants, estates, etc., whereby any estate shall pass other than for a term of twenty-one years, or three lives, from such time as they shall begin, etc., shall be utterly void to all intents, purposes and constructions.” That Lord Holt’s reason for pronouncing the whole lease void, was the phraseology of the statute declaring it to be utterly so, is manifest from the very next paragraph, in which he says : “ If the words of the statute were, that they might make leases for any number of years not exceeding twenty-one years, if a lease were made for twenty-two years, it would stand good for twenty-one years.” This opinion *274 then, so far from indicating that a different rule is to prevail where there has been an excess of execution of statutory powers, is an authority for the position that the same rule is applicable to both.
The case of Bright v. Boyd (1 Story C. C. Rep. 478), is merely that courts of equity will not aid the defective execution of a statutory power, by dispensing with any of the formalities required for its execution, because “ otherwise the whole policy of the statute might be overturned.” We do not doubt the propriety of that decision, but deem it inapplicable to an excessive execution.
None of the cases to which we have been referred, go the length of holding, that where there has been a full execution of the statutory power, and something which is unauthorized has been added, as in the case at bar, or that where the execution is in excess, and the excess is distinguishable from the full execution, that such excessive executipn is not a legal execution of the power to the extent of the authority, and void only as to the excess.
We see no valid reason for a distinction in this respect between powers created by act of an individual, and those created by statute; and the policy of the statute would seem to require, that in such cases the execution should be held good to the extent of the authority conferred, and void only as to the excess.
Demurrer to reply overruled, and cause remanded to the district court.
Brinkerhoee, Scott and Wilder, JJ., concurred.
Ranney, J.
The most favorable view which can. be taken of the act, under which the bonds of the county were issued, and which constituté the consideration of the obligation sued upon in this action, is to regard the law as authorizing the county, indirectly, to subscribe to the capital stock of a railroad corporation, authorized to construct a public improvement through the county. I do not say that the act is, or is not, open to this construction; but assuming that it is, and *275 proceeding upon the admitted fact, that no steps were taken toward an execution of the powers it confers, until after the present constitution of the state had taken effect, the case is not to be distinguished from that of Cass v. Dillon, 2 Ohio St. Rep. 607, decided by this court at the December term, 1853. In that ease, I have stated at length the reasons which led me to the conclusion, that all such legislation ceased to exist, and was absolutely revoked, upon the taking effect of this constitution. I do not propose to repeat any of the reasons then assigned, and it is only necessary now to say, that they were such as to produce upon my mind the absolute conviction, that such legislation is inconsistent, not only with several express provisions of the constitution, but also requiring for its execution the exercise of powers not delegated to any department of the'government, but expressly reserved to the people.
I am fully impressed with the weighty consideration, that under the influence of decisions made by this court, in that and other eases, large obligations have been incurred, which are now outstanding in the hands of innocent holders; and I am free to admit that this may rightfully constitute, with those who can consider the question originally doubtful, a conclusive reason why these decisions should not now be disturbed. For myself, I do not share in any such doubt; and as my convictions remain wholly unchanged, and the principle may have a still wider extent in its application to other statutes, I feel bound to adhere to the opinion heretofore expressed, and to' dissent from the conclusion to which a majority of the court have arrived.
If there was no law to authorize the issue of bonds by the county, the attempt to bind it was a nullity, and the bond and mortgage of the defendants are without consideration to uphold them. This consideration alone would dispose of the case, and it is, therefore, unnecessary that I should express any opinion upon the other questions made in it.